UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re

**ORLANDO GATEWAY
PARTNERS, LLC,**

CASE NO. 6:15-bk-03448-KSJ

CHAPTER 11

Debtor.

_____/


**JOINT AMENDED AND COMBINED DISCLOSURE STATEMENT
PURSUANT TO 11 U.S.C. § 1125 FOR JOINT AMENDED AND COMBINED PLAN OF
REORGANIZATION FOR NILHAN HOSPITALITY, LLC,
AND ORLANDO GATEWAY PARTNERS, LLC,
SUBMITTED BY SUMMITBRIDGE NATIONAL INVESTMENTS IV LLC,
GOOD GATEWAY, LLC, AND SEG GATEWAY, LLC**


COUNSEL FOR PLAN PROPONENTS – GOOD GATEWAY, LLC
AND SEG GATEWAY, LLC

R. SCOTT SHUKER, ESQ.
LATHAM, SHUKER, EDEN & BEAUDINE, LLP
111 NORTH MAGNOLIA AVENUE, SUITE 1400
ORLANDO, FLORIDA 32801


COUNSEL FOR PLAN PROPONENT – SUMMITBRIDGE NATIONAL
INVESTMENTS IV LLC
RICHARD A. ROBINSON, ESQ.
REED SMITH LLP
1201 NORTH MARKET STREET, SUITE 1500
WILMINGTON, DE 19801


December 15, 2015

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**In re**

ORLANDO GATEWAY
PARTNERS, LLC,

**CASE NO. 6:15-bk-03448-KSJ**

**CHAPTER 11**

Debtor.

_____/

### JOINT AMENDED AND COMBINED DISCLOSURE STATEMENT
### PURSUANT TO 11 U.S.C. § 1125 FOR JOINT AMENDED AND COMBINED PLAN OF
### REORGANIZATION FOR NILHAN HOSPITALITY, LLC,
### AND ORLANDO GATEWAY PARTNERS, LLC,
### SUBMITTED BY SUMMITBRIDGE NATIONAL INVESTMENTS IV LLC,
### GOOD GATEWAY, LLC, AND SEG GATEWAY, LLC

This Disclosure Statement ("Disclosure Statement") is filed pursuant to the requirements of § 1125 of Title 11 of the United States Code (the "Bankruptcy Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned bankruptcy case ("Bankruptcy Case") to make informed judgments about the Joint Amended and Combined Plan of Reorganization for Nilhan Hospitality, LLC ("Nilhan") and Orlando Gateway Partners, LLC[1] ("OGP"; and together with Nilhan, the "Debtors") (the "Plan") submitted by interested parties SummitBridge National Investments IV LLC ("SummitBridge"), Good Gateway, LLC ("Good Gateway"), and SEG Gateway, LLC ("SEG", and together with SummitBridge and Good Gateway, the "Plan Proponents"). The Plan Proponents are soliciting votes to accept the Plan. Capitalized terms contained in this Disclosure shall, unless expressly defined herein, shall have the definitions given to such terms in the Plan. The Plan is designed to facilitate either a reorganization through the Day 90 Reorganization

---

[1] OGP is a Chapter 11 debtor in bankruptcy case no. 6:15-bk-03448-KSJ, and is an affiliate and insider of Nilhan.

Option or a prompt sale of the Assets and prompt distributions to Holders of Allowed Claims through either the Day 90 Sale Option or the Day 180 Sale Option. The Plan Proponents believe interested parties should not be exposed to the risk that Confirmation and the administration of the Bankruptcy Cases are delayed while the Debtors, Nilhan Financial, Good Gateway and SEG engage in protracted litigation.

Absent a prompt reorganization or sale, all creditors and interested parties will be exposed to the risk that the Assets deteriorate while the Debtors, Nilhan Financial, Good Gateway and SEG continue to litigate. Under such a scenario, Creditors and the Estates will be further exposed to the risk of expensive, protracted Bankruptcy Cases. The prompt reorganization or sale of the Assets and the prompt distributions contemplated by this Plan eliminates these concerns and risks.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT, AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.**

**NO REPRESENTATION CONCERNING THE PLAN IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE THAT ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF**

THE DEBTORS' BUSINESSES AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.    THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE PLAN PROPONENT'S CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

As prescribed by the Bankruptcy Code and the Rules, Claims asserted against, and equity Interests in, the Debtors are placed into "Classes."

This Plan is the result of negotiations between three of the largest Creditors in these Bankruptcy Cases—SummitBridge, SEG and Good Gateway. SummitBridge was the plan proponent with respect to a plan that contemplated a prompt sale of the Assets. In contrast, SEG and Good Gateway were the plan proponents with respect to a plan that provided for the reorganization of the Estates and for Mr. Carson Good to gain control of the Assets. This Plan effectuates an amendment and combination of those plans.  Under this Plan, there are three Plan Consummation Options:  (a) the Day 90 Sale Option; (b) the Day 90 Reorganization Option; and (c) the Day 180 Sale Option.  In general terms, the Plan Consummation Options are as follows:

- Under the Day 90 Sale Option, if SEG and Good Gateway file with the Bankruptcy Court the Day 90 Sale Proceed Notice prior to February 3, 2016, then under the Day 90 Sale Option this Plan shall be automatically modified, without need to file a modification, to adopt the provisions of the Day 90 Sale Option and to effectuate the Sale of the Assets through the Auction which will be consummated on or before Day 90.

- Under the Day 90 Reorganization Option, if the Class 2 Claim of SummitBridge is indefeasibly paid in full on or prior to Day 90, which is 90 days after entry of the Confirmation Order, through means other than the Sale, then the Plan will effectuate a reorganization of the Estates pursuant to the terms of this Plan that will occur on Day 90.

- Under the Day 180 Sale Option, if, however, the Day 90 Reorganization Date does not timely occur and the Day 90 Sale Option is not exercised, then under the Day 180 Sale Option the Assets will be subject to the Sale through the Auction which will be consummated on or before Day 180.

In all instances, the Plan Representative will be appointed pursuant to the Confirmation Order and shall begin to administer the Estates on the Effective Date. Under the Day 90 Reorganization Option, the Plan Representative will act as the representative of the Estates until the Day 90 Reorganization Date, at which time the Reorganized Debtors shall be responsible for consummating this Plan and administering the Estates. Under the Day 90 Sale Option and the Day 180 Sale Option, the Plan Representative shall continue to serve until the entry of the Final Decree.

*Automatic adoption of the Day 90 Sale Option if the Bankruptcy Court Determines the Day 90*
*Reorganization Option Does Not Satisfy the Plan Confirmation Requirements Under Section*
*1129 of the Bankruptcy Code .*

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS
PLAN, IF THE BANKRUPTCY COURT DETERMINES FOR ANY REASON
WHATSOEVER THAT THE PROVISIONS OF THIS PLAN CONCERNING THE DAY
90 REORGANIZATION OPTION RENDERS THIS PLAN UNCONFIRMABLE
BECAUSE, WITH THOSE PROVISIONS, THE PLAN DOES NOT SATISFY THE
REQUIREMENTS FOR CONFIRMATION OF A PLAN UNDER SECTION 1129 OF
THE BANKRUPTCY CODE, THEN THIS PLAN SHALL BE AUTOMATICALLY
MODIFIED AT THE CONFIRMATION HEARING, WITHOUT NEED TO FILE A
MODIFICATION, TO DELETE THE PLAN CONSUMMATION OPTION DEFINED IN
THIS PLAN AS THE DAY 90 REORGANIZATION OPTION AND THE DAY 180 SALE
OPTION, AND THE PLAN PROPONENTS WILL REQUEST THAT THE
BANKRUPTCY COURT CONSIDER CONFIRMATION OF THE PLAN AT THE
CONFIRMATION HEARING WITH THE ONLY PLAN CONSUMPTION OPTION
BEING THE DAY 90 SALE OPTION.

*Optional Election of SEG and Good Gateway by filing the Day 90 Sale Proceed*
*Notice to Modify the Plan By Removing the Day 90 Reorganization Option and Day 180 Sale*
*Option From the Plan.*

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS
PLAN, IF SEG AND GOOD GATEWAY FILE THE DAY 90 SALE PROCEED NOTICE
PRIOR TO FEBRUARY 3, 2016 TO PROVIDE NOTICE THAT THEY WILL NOT
PURSUE THE DAY 90 REORGANIZATION OPTION AND THE DAY 180 SALE

**OPTION, THEN THIS PLAN SHALL BE AUTOMATICALLY MODIFIED, WITHOUT NEED TO FILE A MODIFICATION, TO DELETE THE PROVISIONS THAT CONCERN THE DAY 90 REORGANIZATION OPTION AND DAY 180 SALE OPTION, AND THE PLAN SHALL THEREAFTER REQUIRE THAT THE SALE BE CONSUMMATED ON OR PRIOR TO DAY 90 UNDER THE DAY 90 SALE OPTION.**

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired," and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan ("Ballot") will be mailed along with the Plan.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is _____, 2016. All votes must be received by the voting agent by 5:00 p.m. (EST) on that day.

---

Upon receipt, the Ballots will be tabulated, and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section III of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing to consider whether the Plan complies with those requirements (the "Confirmation Hearing").

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section V of this Disclosure Statement, the Plan

Proponents have expressly reserved the right to seek cramdown in the event all Impaired Classes do not vote in favor of the Plan.

## I.    DESCRIPTION OF DEBTORS' BUSINESSES

In an effort to aid creditors in the voting process, Good Gateway and SEG provide the disclosures set forth in Article I.[2] OGP was formed on or around August 16, 2007, for the purpose of acquiring and developing that certain real property generally located at the northwest corner of The Beachline Expressway (SR 528) and Semoran Boulevard (SR 436), Orlando, Florida, originally consisting of approximately 60 acres (the "Original Property"). OGP's development efforts for the Original Property involved a multi-phase, mixed use development featuring hotels, Class "A" office space, boutique retail, restaurants and luxury apartments, which is commonly referred to as the Orlando Gateway Project (the "Project"). In 2009, as set forth in more detail below, OGP "sold" two parcels of the Original Property to Nilhan. The portion of the Original Property that is still currently owned by OGP (the "OGP Property") consists of four separate parcels (nos. 28-23-30-6331-00-010; 28-23-30-6331-00-040; 28-23-30-6332-01-000; and 28-23-30-6332-02-000). One parcel (approximately 17 acres) has been partially developed, with a portion of it leased to Sixt Rent-A-Car, LLC. A small parcel (approximately 0.14 acres) is rented to Clear Channel Worldwide and contains a billboard. The remaining two parcels (approximately 10.75 and 20.10 acres respectively) are currently vacant and undeveloped commercial properties.

Nilhan is a Florida limited liability company formed on October 26, 2009, with its principal place of business located at 17885 Collins Avenue, Unit 4001, Sunny Isles Beach, Florida. In 2009, OGP transferred to Nilhan approximately 15.75 acres of the Original Property

---

[2] The disclosures contained in Article I and II are statements made by Good Gateway and SEG and not SummitBridge. Accordingly, the statements and averments in Article I and II shall not be construed as an admission by SummitBridge or otherwise be used adversely to SummitBridge.

located near the Orlando International Airport on the West side of South Semoran Boulevard and North of the State Road 528/The Beachline Expressway (the "Nilhan Property"). The Nilhan Property consists of two separate parcels (numbers 28-23-30-6332-02-002 and 28-23-30-6332-02-003). One parcel (approximately 7.27 acres), which was one of the most valuable parcels of the Original Property, has been partially developed and has two buildings located at 5463 Gateway Village Circle and 5475 Gateway Village Circle, which are approximately 15,000 square feet in size. The buildings are used as retail space and are leased to tenants including Bonefish Grill, Carraba's Italian Grill, International House of Pancakes, Ari Hibachi and Sushi Japanese Restaurant, and a nail and hair salon. A space for a Remax real estate is currently in buildout. The second parcel (approximately 8.47 acres) is vacant.

Nilhan's manager is Chittranjan "Chuck" Thakkar ("Thakkar"), who also owns 70% of the Nilhan's outstanding membership interests, and who indirectly owns and controls OGP. The other two equity owners of Nilhan are Niloy Thakkar and Rohan Thakkar, who each hold a 15% membership interest, respectively. Thakkar is also the principal and/or representative several non-debtor entities, including but not limited to: (i) Niloy & Rohan, LLC ("Niloy"), a Georgia limited liability company; (ii) Orlando Gateway, LLC, a Georgia limited liability company ("OG"); (iii) Nilhan Financial, LLC ("Nilhan Financial"), a Georgia limited liability company; (iv) NCT Systems, Inc., a Florida corporation ("NCT"); (v) and Niloy, Inc., a Georgia corporation doing business as DCT Systems, Inc. and/or "DCT" ("Niloy, Inc." and/or "DCT"). OGP's membership interests are held by the Thakkar controlled and owned entities NCT (45%) and Niloy (55%).

## II.    REASONS FOR BANKRUPTCY FILING.

SEG and Good Gateway believe the Debtors both filed their Chapter 11 petitions to prevent the Nilhan Property and the OGP Property (together, the "Debtors' Real Property") from

being sold at foreclosure sales.  SEG and Good Gateway provide the background of the events leading up to the foreclosure sale to provide context for the Debtors' bankruptcy filings and the Plan.[3]

On March 27, 2009, OGP transferred the Nilhan Property to Nilhan for $7,500,000.00, which sale was financed by BB&T (the "Nilhan Sale").  Nilhan granted BB&T a first-priority mortgage lien on the Nilhan Property as security for the BB&T loan in the amount of $7,989,614.00 (the "BB&T Loan").  (BB&T's mortgage debt has since been assigned to SummitBridge).  Upon information and belief, the purpose of the Nilhan Sale was for Thakkar to deprive Good Gateway of its ownership interest in the Nilhan Property without providing it any compensation.  At the time of the Nilhan Sale, OGP's membership was comprised of SEG and Niloy, and SEG consisted of two (2) members—Good Gateway and OG.  The Nilhan Sale was conducted without Good Gateway's consent or approval, in violation of OGP and SEG's respective operating agreements.  The Nilhan Property was and remains one of the, if not the, most valuable portions of the Original Property.

Additionally, as part of the Nilhan Sale, Nilhan Financial, which acquired a $24,262,052.00 mortgage on the Original Property from Georgian Bank on August 22, 2008, released its mortgage rights regarding the Nilhan Property, but did not reduce the amount of the mortgage remaining on the rest of the Original Property (i.e., the OGP Property).  Later, on December 1, 2012, Nilhan financial allegedly provided additional financing to OGP secured by the OGP Property, upping the amount of its mortgage debt encumbering the properties to $32,314,409.69.  However, the Debtors have provided no evidence that these additional sums were actually lent.  Moreover, the Debtors have provided no evidence that OGP ever made

---

[3] See Footnote 2 as such also applies to Article II.

interest payments on the Nilhan Financial debt Thakkar regularly characterized this "debt" as equity on OGP's books and records.

As soon as Good Gateway discovered the Nilhan Sale, it objected and raised concerns over the circumstances surrounding the transfer. OG, Niloy, Nilhan Hospitality, Niloy, Inc., and Thakkar all represented to Good Gateway that the improper Nilhan Sale would be unwound and restructured, and Good Gateway's rights and interest in the Nilhan Property would be restored or reinstated. Ultimately, however, title to the Nilhan Property was never transferred back to OGP and it remains titled in Nilhan's name, as reflected on Nilhan's Schedules.

On July 10, 2010, because Good Gateway's rights in the Nilhan Property were never actually restored as promised, Good Gateway filed a complaint commencing the litigation styled *Good Gateway, LLC v. Orlando Gateway Partners, LLC, et al.*, Case No. 2010-CA-015315-O (Division 43) (the "State Court Litigation"), in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida (the "State Court"). In 2012, SEG filed its Cross Claims in the State Court Litigation against the Debtors, Thakkar, and Nilhan Financial, among others.

On March 5, 2013, while the State Court Litigation was pending, Nilhan refinanced the BB&T Loan and executed an Amended and Restated Secured Promissory Note in the amount of $3,200,000.00 in favor of BB&T (the "Restated BB&T Note"), and that certain Real Estate Note in the amount of $3,000,000.00. Also on March 5, 2013, the 2009 mortgage in favor of BB&T was modified, as Nilhan executed a Mortgage, Assignment of Rents and Security Agreement in favor of BB&T. Finally, the same day, OGP executed a Mortgage, Assignment of Rents and Security Agreement dated March 5, 2013, and a Hypothecation Agreement pursuant to which OGP pledged the entirety of the OGP Property as collateral for the repayment of the entire amount of the original BB&T Loan ($7,989,615.00).

In fall 2014, and after a jury trial, the State Court Litigation resulted in three judgments entered in favor of the SEG and Good Gateway totaling in excess of $15 million against the Debtors, Thakkar individually, Niloy, and NCT (collectively, the "Judgments"). The jury in the State Court Litigation found the following: (i) the Debtors, Thakkar, NCT, and Niloy were jointly and severally liable to SEG for $12,000,000.00 on the tort claims of: (a) breach of fiduciary duty; (b) tortious interference; (c) civil conspiracy; (d) conversion, and (e) constructive fraud; (ii) OGP and Niloy were also jointly and severally liable to SEG for breach of contract, as such $3,376,435.58 in prejudgment interest was attached to the $12,000,000.00 verdict; and (iii) Thakkar, the Debtors, Niloy and NCT were jointly and severally liable to Good Gateway for $2,500,000.00 on the tort claims of: (a) breach of fiduciary duty; (b) tortious interference; (c) civil conspiracy; (d) conversion, and (e) constructive fraud.

On October 3, 2014, the SEG and Good Gateway filed certified copies of the Judgments in the public records for Orange County, Florida. Although the Judgments were timely appealed—*Orlando Gateway Partners, LLC, etc. et al. v. SEG Gateway, LLC, etc., et al.*, Case No. 5D14-3962; *Chittranjan K. Thakkar, an Individual, et al. v. Good Gateway, LLC, etc., et al.*, Case No. 5D14-3964, both pending in the Fifth District Court of Appeal for the State of Florida (together, the "Appeals")—a stay of execution was not obtained, and the State Court issued a writ of execution. The Orange County Sheriff levied on the Debtors' Real Property and scheduled an execution sale for April 21, 2015. The Debtors' bankruptcy petitions were filed on the day before the scheduled Sheriff's sale, April 20, 2015 (the "Petition Date").

On February 25, 2015, Nilhan Financial filed its Complaint in the State Court against OGP, SEG and Good Gateway, among others, seeking to foreclose on the OGP Property (Case No. 2015-CA-001815-O (Division 32)) (the "Foreclosure Litigation"). Nilhan Financial did not seek to sequester rents or appoint a receiver over OGP. On April 16, 2015, SEG and Good

Gateway filed an Answer, Affirmative Defenses & Counterclaim against the Debtors and Nilhan Financial. Although OGP never filed an answer in the Foreclosure Litigation, Nilhan Financial has never moved for entry of a default against OGP.

III.    **EVENTS AFTER THE PETITION DATE.**

On May 7, 2015, the Debtors filed their Application to Retain Kenneth D. Herron, Jr. as their counsel in their respective bankruptcy cases (Doc. Nos. 22 (Nilhan); Doc. No. 18 (OGP).[4] On June 8, 2015, the Bankruptcy Court approved Mr. Herron's retention (Doc. Nos. 30; 33).

On May 14, 2015, the Debtors filed their respective Schedules (Doc. Nos. 25; 22). The Schedules state the value of the Nilhan Property is $7,749,270.00 and the value of the OGP Property is $9,184,163.00.

On May 18, 2015, the US Trustee conducted the initial § 341 meeting of creditors for both Debtors, which was continued to June 8, 2015, then continued to June 22, 2015, and finally concluded on July 6, 2015.

On May 27, 2015, the Debtors filed their Motions for Relief from the Automatic Stay (Doc. Nos. 27; 26), with the consent and agreement of theSEG and Good Gateway, seeking relief from stay to allow the Appeals of the Judgments to go forward. On June 2, 2015, the Bankruptcy Court granted the Motions for Relief from Stay (Doc. Nos. 28; 26).

On June 8, 2015, the United States Trustee's office filed its Motion to Dismiss Case with Two-Year Injunction, or to Convert Case to Chapter 7 (Doc. Nos. 31; 32) (the "Motion to Dismiss").

On June 15, 2015, SEG and Good Gateway filed their Motion to Appoint Chapter 11 Trustee and Memorandum of Law in both of the Debtors' bankruptcy cases (Doc. Nos. 37; 35) (the "Trustee Motions"). The Trustee Motions sought the appointment of an independent trustee

---

[4] All subsequent docket entry numbers will refer to Nilhan's case first, OGP's second.

to operate the Debtors' businesses during the pendency of these Bankruptcy Cases due to the mistrust between the SEG and Good Gateway and Thakkar, who was still managing and controlling both Debtors, and the evidence of abuse of the legal system and mismanagement of the Debtors' books and records.

On June 16, 2015, the Debtors filed their Application to Retain Larry S. Hyman, CPA, as Restructuring Advisor and Chief Restructuring Officer (Doc. No. 38; 36) (the "Hyman Application").  The same day, the Debtors also filed their Emergency Motions to Use Cash Collateral (Doc. No. 39; 37) (the "Cash Collateral Motions").

On June 17, 2015, the Bankruptcy Court held its initial status conference in both Bankruptcy Cases.  At the hearing, the Court directed the parties to attend a mediation settlement conference on or before July 23, 2015.  The Court also set for a final evidentiary hearing on July 27, 2015 (i) the Motion to Dismiss, (ii) the Trustee Motions, (iii) the Hyman Application, and (iv) the Cash Collateral Motions.

On July 7, 2015, the Debtors filed their Motions for Substantive Consolidation, with Memorandum of Law in Support (Doc. No. 46; 42) (the "SubCon Motions"), seeking the substantive consolidation of Nilhan and OGP.

On July 10, 2015, the Debtors filed their Notice of Removal of the State Court Litigation, *the business day before* the State Court was scheduled to hear and rule on SEG's and Good Gateway's Motion for Fees and Costs Pursuant to Court Orders, filed on October 1, 2014 (e-filing no. 18874855), and their Motion to Tax Costs filed on March 2, 2015 (e-filing no. 24383179).  The Notices of Removal filed by the Debtors initiated Adversary Proceeding Numbers 6:15-ap-00083-KSJ (in the Nilhan Hospitality case), and 6:15-ap-00084-KSJ (in the OGP case) (together, the "Removed Actions").

On July 17, 2015, the U.S. Trustee's office filed its (i) Motion for Disqualification of Kenneth D. Herron Jr. and Wolff, Hill, McFarlin & Herron, P.A. as Counsel for the Debtors (Doc. Nos. 50; 48), (ii) Objection to the SubCon Motions (Doc. Nos. 51; 49), and (iii) Objection to the Hyman Application (Doc. Nos. 52; 50).

On July 21, 2015, the Debtors, the Plan Proponents, and Nilhan Financial attended a mediation settlement conference mediated by Mr. Harley Riedel.  The mediation ultimately reached an impasse.

At the July 27th final evidentiary hearing, the parties to the mediation announced their agreement (i) for the Debtors to withdraw the Hyman Application; (ii) for the Plan Proponents to withdraw their Trustee Motions, (iii) to move jointly *ore tenus* to terminate exclusivity (which was granted in open court), (iv) for the Debtors to file an application to retain Terry Soifer as Chief Restructuring Officer, (v) for Debtors to withdraw the Subtantive Consolidation Motions; and (vi) to the entry of an order allowing any party in interest to file a written objection to the Bankruptcy Court having jurisdiction over the issues raised in the Removed Actions, including the trial of all post-judgment matters and supplementary proceedings, and further providing that if any party timely objects, then the Removed Actions will be remanded to the State Court.  Also at the July 27th hearing, the U.S. Trustee consented to the denial of its Motion to Dismiss.

The next day, July 28, 2015, the Debtors filed their Application to Retain Terry Soifer as Chief Restructuring Officer.

On August 12, 2015, the Bankruptcy Court entered its Order Denying the Motion to Dismiss (Doc. Nos. 64; 61), its Order Granting Joint Ore Tenus Motion to Terminate Exclusivity (Doc. Nos. 65; 59), and its Agreed Order on Jurisdictional Issues (Doc. No. 8 in Adv. Pro. No. 6:15-ap-00083-KSJ; Doc. No. 53 in Adv. Pro. No. 6:15-ap-00084-KSJ), allowing any party to

file an objection to the Bankruptcy Court's exercise of jurisdiction over the Removed Actions within fourteen (14) days of entry of the Order.

On August 21, 2015, SEG and Good Gateway, filed an adversary complaint to (i) re-characterize the Nilhan Financial loan as equity, (ii) determine that the Nilhan Financial mortgage has terminated under Fla. Stat. § 95.281(a), and (iii) to subordinate any allowed secured claim of Nilhan Financial to the judgment liens of the Plan Proponents (the "Nilhan Financial Adversary"). Nilhan Financial moved to dismiss the Nilhan Financial Adversary and, on November 17, 2015, the Court denied that motion. The Plan provides for alternative treatment of Nilhan Financial's claims based on the possible outcomes of the Nilhan Financial Adversary.

In addition to the Nilhan Financial Adversary, SEG and Good Gateway believe the Estates have causes of action against Thakkar (i) under Chapter 5 of the Bankruptcy Code, including for fraudulent transfers, (ii) for breach of fiduciary duty, (iii) for conversion, and (iv) for lender liability (collectively, the "Causes of Action").

## IV.    THE PLAN

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.    Overview.

All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As detailed more fully below, the Plan contains a total of eleven (11) Classes of Claims and Interests as follows: seven (7) Classes of Allowed Secured Claims; three (3) Classes of Allowed Unsecured Claims; and one (1) Class of Interests. There are nine (9) Classes of Impaired Claim that are entitled to vote on the Plan, and two (2) Classes of Unimpaired

Claims that are deemed by operation of the Bankruptcy Code to accept the Plan (Classes 4 and 6).

On the Effective Date, the Plan provides that the Debtors' assets and liabilities will be vested, respectively, with two Reorganized Debtors, which will be obligated to make their respective Plan Payments. Further, on the Effective Date, Holders of Allowed Administrative Claims will be paid in full. Holders of Allowed Unsecured Priority Tax Claims (which does not include ad valorem tax claims) will be paid by the Reorganized Debtors, with interest, over a period of five (5) years. The Holders of Allowed Secured Claims will retain their respective liens on the subject properties and be paid in full either from the Auction or over time, as set forth below and in the Plan. The Holders of Allowed Secured Tax Claims shall be paid in full, with interest accruing at the Statutory Rate (as defined in the Plan), either from the Auction or over a period of five (5) years from the Petition Date.

The two Classes of Allowed General Unsecured Claims consists of the respective claims of general unsecured creditors except for any Allowed Unsecured deficiency claim of Nilhan Financial, which shall be separately classified based on the nature of Nilhan Financial's claim. All other Allowed Unsecured Claims shall be paid in full as set forth in the Plan, either from the Proceeds of Sale, or from Newco on the Maturity Date. The Allowed Unsecured Claim of Nilhan Financial will be paid either from the Proceeds of Sale or from the Causes of Action after payment in full of the OGP Allowed General Unsecured Claims. The Class of Equity Interests consists of all membership interest in the Debtors, respectively, existing as of the Petition Date, which Interests shall be extinguished on the Effective Date. Under the Day 90 Reorganization Option, the Equity Interests in the Reorganized Debtors shall be issued to Newco in exchange for Newco's commitment to fund the Plan Payments noted herein, the Class 7 Debt

Service Reserve, the Classes 8 and 9 Payoff, and all legal costs and expenses to pursue the Causes of Action.

Automatic adoption of the Day 90 Sale Option if the Bankruptcy Court Determines the Day 90 Reorganization Option Does Not Satisfy the Plan Confirmation Requirements Under Section 1129 of the Bankruptcy Code.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN, IF THE BANKRUPTCY COURT DETERMINES FOR ANY REASON WHATSOEVER THAT THE PROVISIONS OF THIS PLAN CONCERNING THE DAY 90 REORGANIZATION OPTION RENDERS THIS PLAN UNCONFIRMABLE BECAUSE, WITH THOSE PROVISIONS, THE PLAN DOES NOT SATISFY THE REQUIREMENTS FOR CONFIRMATION OF A PLAN UNDER SECTION 1129 OF THE BANKRUPTCY CODE, THEN THIS PLAN SHALL BE AUTOMATICALLY MODIFIED AT THE CONFIRMATION HEARING, WITHOUT NEED TO FILE A MODIFICATION, TO DELETE THE PLAN CONSUMMATION OPTION DEFINED IN THIS PLAN AS THE DAY 90 REORGANIZATION OPTION AND THE DAY 180 SALE OPTION, AND THE PLAN PROPONENTS WILL REQUEST THAT THE BANKRUPTCY COURT CONSIDER CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING WITH THE ONLY PLAN CONSUMPTION OPTION BEING THE DAY 90 SALE OPTION.**

Optional Election of SEG and Good Gateway by filing the Day 90 Sale Proceed Notice to Modify the Plan By Removing the Day 90 Reorganization Option and Day 180 Sale Option From the Plan.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN, IF SEG AND GOOD GATEWAY FILE THE DAY 90 SALE PROCEED NOTICE**

PRIOR TO FEBRUARY 3, 2016 TO PROVIDE NOTICE THAT THEY WILL NOT PURSUE THE DAY 90 REORGANIZATION OPTION AND THE DAY 180 SALE OPTION, THEN THIS PLAN SHALL BE AUTOMATICALLY MODIFIED, WITHOUT NEED TO FILE A MODIFICATION, TO DELETE THE PROVISIONS THAT CONCERN THE DAY 90 REORGANIZATION OPTION AND DAY 180 SALE OPTION, AND THE PLAN SHALL THEREAFTER REQUIRE THAT THE SALE BE CONSUMMATED ON OR PRIOR TO DAY 90 UNDER THE DAY 90 SALE OPTION.

    B.    Classification and Treatment of Claims.

        1.    Administrative and Priority Tax Claims

            a.    Administrative Claims. Holders of all Allowed Administrative Claims of both Debtors shall be paid in full, from Newco, on the Effective Date or, if the claim does not become allowed prior to the Effective Date, on the date the Allowed Amount of such claim is determined by Final Order of the Court. However, nothing in this provision of the Plan shall preclude the Reorganized Debtors from paying a holder of an Administrative Claim less than one hundred percent (100%) of its Allowed Claim in Cash on the Effective Date, provided that such Claim holder consents to different payment terms. The Plan Proponents estimate Administrative Claims to be approximately $75,000.00.

            b.    Priority Tax Claims. Except to the extent that the Holder and the Plan Proponents have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtors, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims, which do not include Secured Claims for real property taxes, will be paid in full on the Effective Date or on the date such Priority Tax Claim becomes Allowed. The filed amount of Priority Tax Claims is approximately $0.00.

2.    Secured Claims.

a.    Class 1 - Allowed Secured Claims of the SEG and Good Gateway.

Class 1 consists of the Allowed Secured Claims of SEG and Good Gateway, respectively, that are secured by judgment. The Allowed Amount of the Class 1 Claims shall be as determined by final adjudication or other resolution of the Appeals of the Judgments. In full satisfaction of their Class 1 Claims, SEG and Good Gateway shall retain their liens on Property of the Estate to the extent and in the priority established by the Bankruptcy Court in the Nilhan Financial Adversary, and shall be paid under the Plan Consummation Options as follows:

i.    Day 90 Reorganization Option. SEG and Good Gateway shall retain their liens and the Claims shall be paid within three (3) years after the date of final adjudication or other resolution of the Appeals in favor of SEG and/or Good Gateway, with such Claims to accrue interest at 5% per annum. Payments shall not commence, and interest shall not accrue, until after final adjudication or other resolution of the Appeals. SEG and Good Gateway may, in their sole discretion, release their liens or any portion of such liens to allow for future development or a sale of any portion of the Reorganized Debtors' Real Property;

ii    Day 90 Sale Option and Day 180 Sale Option. The Allowed Class 1 Claim shall be paid, in full satisfaction of their Claims, from the Sales Proceeds after determination by the Bankruptcy Court or agreement with Nilhan Financial of the Claims relative priority. After full payment of Class 2, 3, 4, 5, 6, 8 and 9 Claims, the Liens of Class 1, to the extent of the Allowed Amount, shall attach to the Net Sale Proceeds to the extent, validity, and priority as determined by the Bankruptcy Court, or agreed with Nilhan Financial, and the distribution with respect to such proceeds shall not be made until such determination by the Bankruptcy Court or agreement of the parties.

b.    <u>Class 2 – Allowed Secured Claim of SummitBridge National Investments IV LLC</u>. Class 2 consists of the Allowed Secured Claim of SummitBridge in the amount of not less than $5,290,194.38 (plus additional principal, interest, costs and fees (including legal fees) due under the applicable loan documents, but less any principal payments made after December 10, 2016). The Claim is secured by first priority Liens on the Assets. SummitBridge shall retain its Liens until it is paid in full. The Class 2 Claim shall not, on or after the Confirmation Date, be subject to any avoidance, reductions, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection or any other challenges or objections under any applicable law or regulation by any person or entity. Upon entry of the Confirmation Order, the Class 2 Claim shall be an Allowed Secured Claim in the amount of not less than $5,290,194.38 (plus additional principal, interest, costs and fees (including legal fees) due under the applicable loan documents, but less any principal payments made after December 10, 2016) that is secured by a first priority lien on the Assets. In full satisfaction of its Class 2 Claim, SummitBridge shall receive under the Plan Consummation Options as follows:

i.    Day 90 Reorganization Option. The Allowed Secured Claim of SummitBridge shall be indefeasibly paid in full no later than Day 90, provided, however, such payoff amount shall be calculated using the non-default, interest rate under the applicable loan documents;

ii.    Day 90 Sale option and Day 180 Sale Option. At the Sale, the Assets (excluding Cash in the Estates' accounts to the extent necessary to pay existing Administrative Claims) shall be transferred to SummitBridge in exchange for a credit bid of its Allowed Claim, or if the Sale results in a bid higher than the Allowed Secured Claim of SummitBridge, then SummitBridge shall be indefeasibly paid in Cash, on the Closing Date, from

the Proceeds of the Sale the full amount of its Allowed Secured Claim. SummitBridge shall retain its Lien until full indefeasible payment of its Allowed Claims, but shall be stayed, except as set forth herein, from enforcing its rights and remedies on account or its Allowed Secured Claim available under applicable state law until the Auction Date or a breach under this Plan.

        iii.   <u>All Plan Consummation Options</u>.  Until the SummitBridge Class 2 Claim has been indefeasibly paid in full, SummitBridge shall continue to receive the same monthly payments as it has received post-petition ($40,000 per month) with such payments applied under the applicable loan documents at the discretion of SummitBridge. If net cash after Agreed Operating Expenses is insufficient to make the monthly payments to Class 2, SummitBridge will be paid on a monthly basis an amount equal to interest only based on a rate of five percent (5%). Conversely, if there is excess cash after payment of the Class 2 Claim and Agreed Operating Expenses, such excess shall be paid, on a monthly basis to SummitBridge. Except to the extent expressly modified by this Plan, the applicable loan documents evidencing all Liens and Claims of SummitBridge shall remain in full force and effect on and after the Effective Date. Class 2 is Impaired.

        c.   <u>Class 3 – Orange County Tax Collector (Nilhan) - 2014</u>.  Class 3 consists of the Allowed Secured Claim of the Orange County Tax Collector for ad valorem property taxes owed by Nilhan related to the Nilhan Property for the 2014 tax year. In full satisfaction of its Class 3 Claim, the Orange County Tax Collector shall receive under the Plan Consummation Options as follows:

        i.   Day 90 Reorganization Option.  Class 3 shall retain its statutory lien on the Nilhan Property, and shall receive monthly payments of principal and interest, with interest accruing at the Statutory Rate, which is defined in the Plan as the applicable rate of interest allowed to be charged on ad valorem taxes under Florida law,

amortized over 25 years, and a final maturity date that is 60 months after the Petition Date. Payments will commence on the Effective Date.

ii.  Day 90 Sale Option and Day 180 Sale Option.  The Allowed Class 3 Claim will be paid in full, from the Sale Proceeds on the Closing Date.  Class 3 is Impaired.

d.    Class 4 – Orange County Tax Collector (Nilhan) - 2015.  Class 4 consists of the Allowed Secured Claim of the Orange County Tax Collector for ad valorem property taxes owed by Nilhan related to the Nilhan Property for the 2015 tax year.  In full satisfaction of its Class 4 Claim, the Orange County Tax Collector shall retain its statutory lien on the Nilhan Property, and shall be paid in the ordinary course of business when such taxes are assessed in 2016.  Class 4 is Unimpaired.

e.    Class 5 – Orange County Tax Collector (OGP) – 2014.   Class 5 consists of the Allowed Secured Claim of the Orange County Tax Collector for ad valorem property taxes owed by OGP related to the OGP Property for the 2014 tax year.  In full satisfaction of its Class 5 Claim, the Orange County Tax Collector shall receive under the Plan Consummation Options as follows:

i.  Day 90 Reorganization Option.  Class 3 retain its statutory liens on the OGP Property, and shall receive monthly payments of principal and interest, with interest accruing at the Statutory Rate, amortized over 25 years, and a final maturity date that is 60 months after the Petition Date.  Payments will commence on the Effective Date.

ii.  Day 90 Sale Option and Day 180 Sale Option. The Allowed Class 5 Claim shall be paid, in full, from the Sale Proceeds on the Closing Date.  Class 5 is Impaired.

       f.      <u>Class 6 – Orange County Tax Collector (OGP) - 2015</u>.  Class 6 consists of the Allowed Secured Claim of the Orange County Tax Collector for ad valorem property taxes owed by OGP related to the OGP Property for the 2015 tax year.  In full satisfaction of its Class 6 Claim, the Orange County Tax Collector shall retain its statutory liens on the OGP Property, and shall be paid in the ordinary course of business when such taxes are assessed in 2016.  Class 6 is Unimpaired.

       g.      <u>Class 7 – Nilhan Financial, LLC</u>.  Class 7 consists of the Allowed Secured Claim of Nilhan Financial, if any, as such Claim is subject to the Nilhan Financial Adversary.  The Claim of Nilhan Financial is allegedly secured by a first priority mortgage lien on the OGP Property in an amount exceeding $33,000,000.00.  However, the Nilhan Financial Adversary is challenging the validity, extent, and priority of Nilhan Financial's mortgage debt, and further seeks to equitably subordinate any Allowed Secured Claim of Nilhan Financial to the Class 1 Claims.  Thus, the potential outcomes of the Nilhan Financial Adversary yield multiple treatments for Nilhan Financial's claim under the Plan Consummation Options as follows:

       i.      <u>Determination or Agreement Providing Nilhan Financial Mortgage Lien on OGP Property with Priority Over the Liens of SEG and Good Gateway under Day 90 Reorganization Option</u>.  If after the Court's ruling, or upon agreement with SEG and Good Gateway, Nilhan Financial has an Allowed Secured Claim secured by the OGP Property that is superior in priority to the Allowed Secured Claim of SEG and Good Gateway (i.e., its loan is not re-characterized as equity, its mortgage lien is determined not to have terminated under Florida law, and it's claim is not equitably subordinated to the Class 1 Claim of SEG and Good Gateway), then in full satisfaction of its Class 7 Allowed Secured Claim.  Nilhan Financial shall retain its lien (to the extent and priority determined by the Bankruptcy Court or as agreed) and shall receive monthly payments of principal and interest, with interest accruing at 5%, amortized

over 25 years, and a final maturity date 60 months after the Effective Date. Newco shall be required, as part its consideration for the equity interests in the Reorganized Debtors, to post to a designated debt service reserve account on or before Day 90 the Class 7 Debt Service Reserve.

ii.    Determination or Agreement Providing Nilhan Financial with Priority of Mortgage Lien on the OGP Property under Day 90 Sale Option or Day 180 Sale Option. If Nilhan Financial has an Allowed Secured Claim secured by the OGP Property that has priority over the Allowed Secured Claim of SEG and Good Gateway secured by the OGP Property, then the Lien of the Class 7 Claim will attach to the Net Sale Proceeds attributable to the OGP Property (after payment of Class 2, 5 and 6 Claims) to the extent, validity and priority as determined by the Bankruptcy Court, or agreed with SEG and Good Gateway, and the distribution with respect to such proceeds shall not be made until such determination by the Bankruptcy Court or agreement of the parties.

In both i and ii above, Nilhan Financial may have a Class 10 Allowed Unsecured Claim for any deficiency. The Debtors' filed Schedules in these Bankruptcy Cases state the total value of the OGP Property is approximately $9,184,163.00, suggesting Nilhan Financial will have an unsecured deficiency claim.

iii.    Equitable Subordination of Nilhan Financial Under all Plan Consummation Options. If Nilhan Financial's Claim is equitably subordinated to the Class 1 Allowed Secured Claims of SEG and Good Gateway, Nilhan Financial shall have a lien on the OGP Property inferior to the liens of SummitBridge, SEG and Good Gateway on such property, and, thus, a Class 7 Allowed Secured Claim only to the extent the value of the OGP Property exceeds SummitBridge's Claim, SEG's and Good Gateway's Class 1 Claim, and the Claims of Classes 5 and 6, all of which are secured by the OGP Property by superior interests. SEG and Good Gateway estimate that under this scenario Nilhan Financial's Allowed Secured Class 7

Claim will be $0.00 based on the Scheduled values of the OGP Property ($9,184,163.00 in total) as compared to the Senior Secured Claims.  Therefore, the entire Allowed Claim will be treated in Class 10.

        iv.    <u>Loan Re-characterized as Equity Under all Plan Consummation Options</u>.  If Nilhan Financial's purported loans to OGP are deemed equity contributions, Nilhan Financial shall have neither an Allowed Secured Claim nor an Allowed Unsecured Claim.  Accordingly, Nilhan Financial's equity shall be extinguished on the Effective Date.

        3.    <u>Unsecured Claims</u>.

        a.    <u>Class 8 – Allowed Unsecured Claims of OGP</u>.  Class 8 consists of all Allowed Unsecured Claims against OGP *other than* the Allowed Unsecured Claim of Nilhan Financial, which shall be separately classified as a Class 10 Claim.  In full satisfaction of their Allowed Class 8 Claims, Holders of Allowed Class 8 Claims shall be paid in full, without interest, under the Plan Consummation Options as follows:

        i.    <u>Day 90 Reorganization Option</u>.  The Allowed Class 8 Claims will be paid on Day 90 from Newco via the Class 8 Payoff.

        ii.    <u>Day 90 Sale Option and Day 180 Sale Option</u>.  Allowed Class 8 Claims shall be paid in full on Day 180 from Net Sale Proceeds attributable to the Sale of the Nilhan Property  Class 8 is Impaired.

        b.    <u>Class 9 – Allowed Unsecured Claims of Nilhan</u>.  Class 9 consists of all Allowed Unsecured Claims against Nilhan *other than* the Allowed Unsecured Claim of Nilhan Financial, which shall be separately classified as a Class 10 Claim.  In full satisfaction of their Allowed Class 9 Claims, Holders of Allowed Class 9 Claims shall be paid in full, without interest, under the Plan Consummation Options, as follows:

i.      Day 90 Reorganization Option.  Allowed Class 9 Claims shall be paid on Day 90 from Newco via the Class 9 Payoff.

ii.     Day 90 Sale Option and Day 180 Sale Option.  Allowed Class 9 Claims shall be paid in Full on Day 90 from Net Sale Proceeds attributable to Sale of the Nilhan Real Property.    Class 9 is Impaired.

c.      Class 10 – Allowed Unsecured Claim of Nilhan Financial.  Class 10 consists of the Allowed Unsecured Claim of Nilhan Financial, as to any deficiency unsecured claim related to the OGP Property.  The Nilhan Financial Allowed Unsecured Claim is being separately classified because Nilhan Financial's debt is different in character from that of the General Unsecured Claims. Namely, in that Nilhan Financial is owned and controlled by Thakkar and, thus, is an affiliate of the Debtors and, moreover, it holds a purported mortgage on the OGP Property, while the General Unsecured Claims are almost all the unsecured claims of various professionals who are owed fees for services performed for the Debtors prior to the Petition Date.  Moreover, the inclusion in Allowed Class 8 of Nilhan Financial's potentially large unsecured deficiency would significantly dilute any recovery of the legitimate, non-affiliate Unsecured Creditors of the Debtors.  Under all Plan Consummation Options, in full satisfaction of its Allowed Class 10 Claim, Nilhan Financial shall receive the net proceeds of the Causes of Action and any Net Sale Proceeds available for distribution under this Plan after payment in full of all other classes of Claims.  Class 10 is Impaired.

4.      Equity Interests.

a.      Class 11 - Equity in the Debtors.  Class 11 consists of any and all membership interests currently issued or authorized in the Debtors.    Under all Plan Consummation Options, on the Effective Date, all Class 11 membership interests shall be extinguished.  Under the Day 90 Reorganization Option, on the Day 90 Reorganization Date, the

equity membership interests in the Reorganized Debtors shall be sold to, and vested in, Newco in exchange for Newco's agreement to fund all Plan Payments, the Class 7 Debt Service Reserve (if necessary), the Class 8 and 9 Payoffs (as necessary), and all legal expenses and costs to bring the Causes of Action.  Under the Day 90 Sale Option and the Day 180 Sale Option, Equity shall share Pro Rata the Net Sale Proceeds available for payment under this Plan after payment in full of all Allowed Claims.  Class 11 is Impaired.

   C.   Means of Implementation.[5]

      1.   Business Operations and Cash Flow.

         Under the Day 90 Reorganization Option, the Reorganized Debtors will, after the Day 90 Reorganization Date, be owned and operated by Newco, whose principal will be Mr. Carson Good (and any other principals designated and disclosed prior to–twenty (20) calendar days prior to the Ballot Date).  SEG and Good Gateway assert that Mr. Carson Good is an experienced commercial real estate developer with a long record of successful retail development, leasing, financing, and brokering in the State of Florida.  SEG and Good Gateway assert that Mr. Carson Good has strategic plans for all parcels of the OGP Property and Nilhan Property.  Although subject to change, Mr. Carson Good believes that under his leadership the Reorganized Debtors can (i) fully lease the shopping center on the Nilhan Property to generate an additional $300,000.00 in net operating income after approximately 18 months; (ii) develop the vacant parcels of the OGP Property through either a joint venture or refinancing for either a residential, Class A, apartment complex or a hotel franchise; and (iii) lease certain of the currently vacant outparcels on the OGP Property, which should generate approximately $100,000.00 in additional net operating income each year.  Additionally, SEG and Good Gateway assert that Mr. Carson Good has the experience and ability to secure a refinancing of

---

[5] These statements contained in this subsection are the product of SEG and Good Gateway and such shall not be attributed to, or used adversely against, SummitBridge.

both the Nilhan Property and the OGP Property if necessary in the event Nilhan Financial has a first-priority Allowed Secured Claim in the full amount of its claim.  Under any scenario, Mr. Carson Good's plans for the Reorganized Debtors will allow the Reorganized Debtors to make all Plan Payments.

Under the Day 90 Sale Option and Day 180 Sale Option, and until Day 90 Reorganization Date under the Day 90 Reorganization Option, the Assets shall be under the control of the Plan Representative.  The Plan Representative shall, engage the Broker for purposes of marketing the Assets on behalf of the Estates and to send the Sale Procedures to (i) all known creditors and parties that have entered appearances in the Bankruptcy Cases and (ii) any individual or entity that has expressed interest in acquiring any Property of the Estates including, without limitation, the Debtors' Real Property (which includes both the OGP Property and the Nilhan Property).  The Auction will be conducted pursuant to the Sale Procedures and the Auction Date shall occur on a date that allows the Sale to close on or before Day 90, under the Day 90 Sale Option, or Day 180, under the Day 180 Sale Option.  At the Auction, no bid will be accepted unless it provides a Cash payment at the Closing adequate to pay the Class 2 Claim of SummitBridge in full.  SummitBridge shall be entitled to credit bid its entire Class 2 Claim at the Auction.  Nilhan Financial, Good Gateway and SEG may be permitted to credit bid all or a portion of their claims only if, at least thirty (30) days prior to the Auction Date, one or more of Nilhan Financial, Good Gateway or SEG, as applicable, obtain entry of an order from the Bankruptcy Court authorizing any such credit bid and the extent that they may credit bid their Liens and Claims in connection with the Auction and the Sale.  Notwithstanding anything to the contrary, any such credit bid by Nilhan Financial, Good Gateway or SEG, and any other bids in connection with the Sale (except for a credit bid submitted by SummitBridge) shall provide for the full payment of the Class 2 Claim of SummitBridge in Cash on the Closing Date.

The Sale shall be made pursuant to Bankruptcy Code Sections 363(b) and (f) and 1123(a)(5)(D), free and clear of all liens, claims, and interests. The Proceeds of Sale shall be used to pay, in full, the Class 2 Claim at the Closing. All other Liens shall attach to the Net Sale Proceeds and be paid as set forth herein. The Net Sale Proceeds not paid at Closing, shall be held until agreement of all parties with alleged liens on the applicable proceeds or until the Court rules upon the validity of contested Claims, and shall thereafter be disbursed in accordance with this Plan.

Under the Day 90 Sale Option and Day 180 Sale Option, the Plan Representative shall be responsible for consummating the Plan and the Sale. The reasonable fees and expenses of the Plan Representative incurred in connection with administering the Estates and consummating this Plan will be entitled to priority over all other claims as costs of administration and the Plan Representative and his professionals will be entitled to hold reasonable retainers. The Plan Representative shall have authority to conduct the day-to-day affairs concerning the Assets. The Plan Representative shall communicate all decisions regarding leases with the Plan Proponents and obtain consent of all Plan Proponents for any change to leases; provided, however, the Plan Representative shall be able to seek Court approval should consent of Plan Proponents not be received. The Property Manager and Broker shall both report to and take direction from the Plan Representative.

2.     Funds Generated During Chapter 11.

Funds generated from operations until the Effective Date will be used for Plan Payments and for general operations; however, the Debtors' cash on hand as of Confirmation shall be available for Administrative Expenses.

3.    Management and Control of Reorganized Debtor.

Under the Day 90 Sale Option and Day 180 Sale Option (and until the Day 90 Reorganization Date under the Day 90 Reorganization Option) the day-to-day operations of the Debtors shall, be overseen by Plan Representative. After the Day 90 Reorganization Date, the day-to-day operations shall be overseen by Mr. Carson Good. At such time, Mr. Carson Good shall have complete authority over the Reorganized Debtors' operations and shall be designated the manager of the Reorganized Debtors.

4.    Membership Interests in the Reorganized Debtor and Newco.

Upon the Effective Date, the Interests in both Debtors shall be extinguished. Under the Day 90 Reorganization Option and on the Day 90 Reorganization Date, the membership Interests in the Reorganized Debtors shall be vested, respectively, 100% in Newco in exchange for Newco's agreement to fund all Plan Payments, the Class 7 Debt Service Reserve (if necessary), the Classes 8 and 9 Payoff (as necessary), and to fund the Causes of Action by paying all legal expenses and costs to pursue such actions. Newco will be a new limited liability company formed by Mr. Carson Good. Good Gateway and SEG shall file no later than twenty (20) calendar days prior to the Ballot Date a full list of its membership interest holders, and each such holder's percentage interests.

D.    Other Provisions.

1.    Leases and Executory Contracts.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN OR APPLICABLE LAW, THE PURCHASER OR THE REORGANIZED DEBTOR, AS APPLICABLE, SHALL HAVE EITHER THIRTY (30) DAYS AFTER DAY 90 OR THE CLOSING DATE, AS APPLICABLE, WITHIN WHICH TO FILE MOTIONS TO ASSUME OR REJECT UNEXPIRED LEASES OR EXECUTORY**

CONTRACTS, AFTER WHICH TIME, IF ANY UNEXPIRED LEASE OR EXECUTORY CONTRACT IS NOT THE SUBJECT OF A FILED MOTION TO ASSUME OR ASSUME AND ASSIGN SUCH LEASE OR CONTRACT, THEN SUCH UNEXPIRED LEASE OR EXECUTORY CONTRACT SHALL BE DEEMED REJECTED. The Purchaser, or the Reorganized Debtor, as applicable, shall be responsible for curing any and all defaults. The unexpired lease between the Debtors and Seito Sushi Celebration, LLC shall be assumed and assigned at the Closing of the Sale. It is the Plan Proponents' position that the executory contracts listed on Schedule G - Executory Contracts and Unexpired Leases, as amended, filed by the Debtors pursuant to Rule 1007, are the only executory contracts to which the Debtors were a party as of the Petition Date. SEG and Good Gateway aver that there are no monetary or nonmonetary defaults to cure. FAILURE TO OBJECT TO THE PLAN SHALL CONSTITUTE A WAIVER OF ANY ALLEGED DEFAULTS.

  2. Procedures For Resolving Disputed Claims.

    a. Prosecution of Objections to Claims. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise provided in the Plan, any party in interest shall have the right to make and file objections to all Claims prior to the Effective Date, and the Plan Representative or Reorganized Debtors, as applicable, [6] shall have the exclusive right to make and file objections to Claims after the Effective Date; *provided*, that any party in interest with a claim objection pending as of the Effective Date may continue to prosecute such pending claim objection to final adjudication or other resolution.

---

[6] Each time this Disclosure Statement references "the Plan Representative or Reorganized Debtors, as applicable," the phrase means that the Plan Representative shall have the specified right and authority unless and until the Day 90 Reorganization Date occurs and, after the Day 90 Reorganization Date, such right and authority shall vest in the Reorganized Debtors.

Unless another time is set by order of the Bankruptcy Court, all objections to Claims and Interests shall be filed with the Court and served upon the Holders of each of the Claims and Interests to which objections are made within 90 days after the Effective Date.

Except as may be specifically set forth herein, nothing in the Plan, the Disclosure Statement, the Confirmation Order, or any order in aid of Confirmation, shall constitute, or be deemed to constitute, a waiver or release of any claim, cause of action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the commencement of the Bankruptcy Case, against or with respect to any Claim or Interest. Except as set forth in the Plan, upon Confirmation the Plan Representative or Reorganized Debtors, as applicable, shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the commencement of the Bankruptcy Cases as if the Bankruptcy Cases had not been commenced.

    b.    <u>Estimation of Claims</u>.   The Plan Proponents may, at any time, request that the Bankruptcy Court estimate any contingent, disputed, or unliquidated Claim pursuant to § 502(c) of the Code, regardless of whether any party in interest has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court estimates any contingent, disputed or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the

estimated amount constitutes a maximum limitation on such Claim, the Plan Proponents may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.

        c.     Cumulative Remedies. All of the aforementioned Claim objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Until such time as an Administrative Claim, Claim, or Interest becomes an Allowed Claim, such Claim shall be treated as a Disputed Administrative Claim, Disputed Claim, or a Disputed Interest for purposes related to allocations, Distributions, and voting under the Plan.

        d.     Payments and Distributions on Disputed Claims. As and when authorized by a Final Order, Disputed Claims that become Allowed Claims shall be paid from the Reorganized Debtors' Cash and Assets, such that the Holder of such Allowed Claim receives all payments and distributions to which such Holder is entitled under this Plan in order to bring payments to the affected Claimant current with the other participants in the particular Class in question. Except as otherwise provided herein, no partial payments and no partial distributions will be made with respect to a Disputed Claim until the resolution of such disputes by settlement or Final Order. Unless otherwise agreed by the Plan Representative or Reorganized Debtors, as applicable, or as otherwise specifically provided herein, a Creditor who holds both an Allowed Claim and a Disputed Claim will not receive a distribution until such dispute is resolved by settlement or Final Order.

        e.     Allowance of Claims and Interests.

        (i)     Disallowance of Claims. All Claims held by Persons against whom the Plan Representative or Reorganized Debtors, as applicable, obtains a Final Order establishing liability for a cause of action under §§ 542, 543, 522(f), 522(h), 544, 545,

547, 548, 549, or 550 of the Bankruptcy Code shall be deemed disallowed pursuant to § 502(d) of the Code, and Holders of such Claims may not vote to accept or reject the Plan, both consequences to be in effect until such time as such causes of action against that Person have been settled or resolved by a Final Order and all sums due to the Reorganized Debtors by that Person are turned over.

        (ii)    <u>Allowance of Claims</u>. Except as expressly provided herein, no Claim or Interest shall be deemed Allowed by virtue of the Plan, Confirmation, or any Order of the Bankruptcy Court in the Bankruptcy Case, unless and until such Claim or Interest is deemed Allowed under the Bankruptcy Code or the Bankruptcy Court enters a Final Order in the Bankruptcy Case allowing such Claim or Interest.

        f.    <u>Controversy Concerning Impairment</u>. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before the Confirmation Date. If such controversy is not resolved prior to the Effective Date, the Debtor's interpretation of the Plan shall govern.

        3.    <u>Effect of Confirmation</u>.

        a.    <u>Authority to Effectuate the Plan</u>. Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided for under this Plan will be deemed to be authorized and approved without the need for any further approval from the Bankruptcy Court. The Confirmation Order will act as an order modifying the Debtors' operating agreements such that the provisions of this Plan can be effectuated. The Plan Representative or Reorganized Debtors, as applicable, shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action is necessary to achieve

Consummation and carry out the Plan, including but not limited to execution of a new operating agreement consistent with the provisions of the Plan.

        b.    <u>Post-Confirmation Status Report</u>. Within 120 days of the entry of the Confirmation Order, the Plan Representative or Reorganized Debtors, as applicable, will file status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan, including a report on the status of the Causes of Action. The status report will be served on the United States Trustee, Holders of Class 8 and 9 Claims, and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.    <u>CONFIRMATION</u>

    A.    <u>Confirmation Hearing.</u>

        Section 1128 of the Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

> <u>Counsel for the Plan Proponents</u>:
> R. Scott Shuker, Esq.
> Latham, Shuker, Eden & Beaudine, LLP
> 111 N. Magnolia Avenue, Suite 1400
> Orlando, Florida 32801
>
> Richard A. Robinson, Esq.
> Reed Smith, LLP
> 1201 North Market Street, Suite 1500
> Wilmington, DE 19801
>
> <u>United States Trustee</u>:
> 400 W. Washington Street, Suite 1100
> Orlando, Florida 32801

B.    <u>Financial Information Relevant to Confirmation</u>.

At least two weeks prior to the Confirmation Hearing the Plan Proponents will provide all creditors with the following information relevant to confirmation of the Plan:

1.    The Reorganized Debtors' financial projections for the three (3) years following the Effective Date (the "Projections"). The Projections will indicate the Reorganized Debtors' operational cash flow will be sufficient to service the required Plan Payments; and

2.    The Debtors' Chapter 7 liquidation analysis (the "Liquidation Analysis"), which will establish that the Creditors of the Debtors will fair materially worse in the event the Debtors are forced into Chapter 7 as compared to the Plan.

C.    <u>Confirmation Standards</u>.

For a plan of reorganization to be confirmed, the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept the plan, that confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in § 1129 of the Code have been met. The Plan Proponents believe that the Plan satisfies all of the requirements for Confirmation.

1.    <u>Best Interests Test</u>.    Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an Allowed Claim or Interest of such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest, property of a value, as

37

of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code.  The Plan Proponents believe that satisfaction of this test will be established by the Liquidation Analysis.

To determine what holders of Claims and Equity Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine how the assets and properties of the Debtors would be liquidated and distributed in the context of a Chapter 7 liquidation case. The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Case, including compensation of attorneys and accountants.  The additional costs and expenses incurred by a trustee in Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors would receive meaningful distributions.  The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

The Plan Proponents have carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and Interest Holders, including the following:

a.    the possible costs and expenses of the Chapter 7 trustee or trustees;

b.    the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for Debtors' assets caused by the forced Chapter 7 liquidation; and

c.     the possible substantial increase in Claims that would rank before or on parity with those of Unsecured Creditors.

2.     <u>Financial Feasibility</u>.  The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors unless the liquidation is proposed in the Plan.  The issue of feasibility is relevant only under the Day 90 Reorganization Option.  As the Projections will demonstrate, SEG and Good Gateway believe that, under Mr. Good's control, core operations of the Reorganized Debtors will generate sufficient cash flow to make all Plan Payments as noted herein.  Based upon the Projections, SEG and Good Gateway assert that the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.

3.     <u>Acceptance by Impaired Classes</u>.  The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such Plan, with the exception described in the following section.  A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan.  Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan, and solicitation of acceptances with respect to such Class is not required.  A Class is Impaired unless: (i) the legal, equitable and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims,

the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

    4.    <u>Confirmation Without Acceptance by all Impaired Classes: "Cramdown."</u>

The Code contains provisions that enable the Bankruptcy Court to confirm the Plan, even though the Plan has not been accepted by all Impaired Classes, provided that the Plan has been accepted by at least one Impaired Class of Claims.  Section 1129(b)(1) of the Code states:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly, and it is fair and equitable with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.

**THE PLAN PROPONENTS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO THE NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

    D.    <u>Consummation</u>.

        The Plan will be consummated and Payments made if the Plan is Confirmed pursuant to a Final Order of the Bankruptcy Court, the Effective Date occurs, and the Plan Representative or Reorganized Debtors, as applicable, and applicable parties reach agreement on any required documents.  It will not be necessary for the Plan Representative or Reorganized

Debtors, as applicable, to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

      E.     <u>Exculpation from Liability</u>.

      The Plan Proponents, the Reorganized Debtors, their respective members, partners, managers, officers, and directors, and their respective Professionals (acting in such capacity) shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, or confirmation of the Plan, the Disclosure Statement, any Plan Document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases; *provided, however*, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. The rights granted hereby are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the Reorganized Debtors, and their respective agents have or obtain pursuant to any provision of the Code or other applicable law, or any agreement. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions hereof shall not release or be deemed a release of any of the Causes of Action otherwise preserved by the Plan. The terms of this exculpation shall only apply to liability arising from actions taken on or prior to the Effective Date.

**ANY BALLOT VOTED IN FAVOR OF THE PLAN SHALL ACT AS CONSENT BY THE CREDITOR CASTING SUCH BALLOT TO THIS EXCULPATION FROM LIABILITY PROVISION. MOREOVER, ANY CREDITOR WHO DOES NOT VOTE IN FAVOR OF THE PLAN AND WHO HOLDS A CLAIM THAT MAY BE AFFECTED BY THIS EXCULPATION FROM LIABILITY PROVISION MUST FILE A CIVIL ACTION IN THE BANKRUPTCY COURT ASSERTING ANY SUCH LIABILITY WITHIN**

**NINETY (90) DAYS FOLLOWING THE EFFECTIVE DATE OR SUCH CLAIMS SHALL BE FOREVER BARRED.**

Notwithstanding the foregoing, (i) the Plan Representative or Reorganized Debtors, as applicable, shall remain obligated to make payments to Holders of Allowed Claims as required pursuant to the Plan and (ii) the Plan Representative's or Reorganized Debtors', as applicable, respective members, partners, managers, and executive officers shall not be relieved or released from any personal contractual liability except as otherwise provided in the Plan.

F.     Police Power.

Nothing in this Article III shall be deemed to effect, impair, or restrict any federal or state governmental unit from pursuing its police or regulatory enforcement action against any person or entity, other than to recover monetary claims against the Debtors for any act, omission, or event occurring prior to Confirmation Date to the extent such monetary claims are discharged pursuant to § 1141 of the Code.

G.     Revocation and Withdrawal of this Plan.

The Plan Proponents reserve the right to withdraw this Plan and Disclosure Statement at any time before entry of the Confirmation Order.  If (i) the Plan Proponents revoke and withdraw this Plan, (ii) the Confirmation Order is not entered, (iii) the Effective Date does not occur, (iv) this Plan is not substantially consummated, or (v) the Confirmation Order is reversed or revoked, then this Plan shall be deemed null and void.

H.     Modification of Plan.

The Plan Proponents may seek to amend or modify this Plan in accordance with § 1127(b) of the Code, remedy any defect or omission, or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  On or before substantial consummation of the Plan, the Plan Proponents may issue, execute, deliver or file with the Bankruptcy Court, or record any agreements and other documents, and take any

action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

## VI.    ALTERNATIVE TO THE PLAN

If the Plan is not confirmed and consummated, the Plan Proponents believe that the most likely alternative is a sale of the Debtors' assets or a liquidation of the Debtors under Chapter 7 or 11 of the Code. In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to Creditors in accordance with the priorities established by the Code. The Plan Proponents' analysis of the probable recovery to Creditors and holders of Equity Interest is set forth in the Liquidation Analysis. In a liquidation or sale, the Plan Proponents believe the value of the Nilhan Property, the OGP Property, and the Debtors' personal property combined will not exceed the dollar amount of claims secured by such property. Moreover, even if the value of the Debtors' property does exceed the dollar amount of Allowed Claims secured by such property, and there are funds to distribute to Unsecured Claim Holders, Nilhan Financial's deficiency claim could be as much as $33,000,000.00, and, as such, the pool of Allowed Unsecured Claims would be significantly increased and the *pro rata* dividend to such Class 8 and 9 Claim Holders will be greatly diminished, possibly to $0.00. Accordingly, the Plan Proponents believe that liquidation of all real and personal property of the Debtors in a Chapter 7 scenario would dramatically reduce the total amount available to Creditors.

## V.    CONCLUSION

The Plan Proponents recommend that Holders of Claims and Interests vote to accept the Plan.

**RESPECTFULLY SUBMITTED** this 15th day of December 2015.

/s/ R. Scott Shuker
**R. Scott Shuker, Esq.**
Florida Bar No. 984469
rshuker@lseblaw.com
**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**
111 N. Magnolia Avenue, Suite 1400
Orlando, Florida 32801
Tel:   407-481-5800
Fax:   407-481-5801
Secondary E-mail: bknotice@lseblaw.com
*Attorneys for SEG and Good Gateway*

/s/ Richard A. Robinson
**Richard A. Robinson, Esq.**
Florida Bar No. 41238
rrobinson@reedsmith.com
**Reed Smith, LLP**
1201 North Market Street, Suite 1500
Wilmington, Delaware 19801
Tel:  302-778-7555
*Attorney for SummitBridge*